Norman R. MOE, et al., Appellants,

v.

SPRINGFIELD MILLING CORPORATION, et al., Respondents.

No. C0–86–660.

Court of Appeals of Minnesota.

Oct. 21, 1986.

Review Denied Dec. 17, 1986.

* * * * * *

(c) are fit for the ordinary purposes for which such goods are used * * *.

Minn.Stat. § 336.2–314 (1984).

Paul N. Muske, Springfield, for appellants.

Kenneth R. White, Gerald L. Maschka, Mankato, for respondents.

Heard, considered and decided by POPOVICH, C.J., and SEDGWICK and NIERENGARTEN, JJ.

## OPINION

SEDGWICK, Judge.

Norman and Genevieve Moe appeal from a summary judgment dismissing their personal injury claims against Springfield Milling Corporation for dioxin poisoning traceable to a cattle feed supplement. The trial court decided the absence of an established dioxin level in humans and appellant's failure to show with reasonable medical certainty a dioxin-related injury to Moe removed all questions of material fact. We believe a causal connection establishing a question of material fact has been demonstrated regardless of the nature of dioxin's background level in the human population and reasonable medical certainty is not required at the pre-trial stage. We reverse and remand for trial.

## FACTS

Appellants commenced this action on October 31, 1977, claiming that a feed supplement purchased from Springfield Milling Corp. was toxic and harmed their personal health and the health of their cattle. Appellants seek compensation for property damage and personal injury. Following hearing on respondents' motion for summary judgment, the trial court dismissed the claims against Hubbard Milling Co. with prejudice. The personal injury claim against Springfield Milling was also dismissed with prejudice and final partial summary judgment was entered. The Moes' appeal the personal injury summary judgment.

Norman Moe is a successful farmer who raised cattle. In late 1973, appellant used a protein supplement formulated and produced by respondent, Springfield Milling Corporation. The supplement was mixed with homegrown feed. The cattle did not thrive on the mixture. Moe noticed most cattle experienced drastically reduced weight gain in comparison to normal levels on his feedlot. Twenty-five head also died on a feedlot where cattle losses were rare. The vets could not determine the cause. After experimenting on his own, Moe decided the feed supplement was responsible and discontinued its use.

After his "resolution" of the feed supplement dilemma, Moe had some cattle slaughtered for personal consumption. Moe claims that after eating the meat he experienced "fever, high blood pressure, slow healing skin sores, chest pains, abdominal cramps, diarrhea, and lack of ability to concentrate." Moe continues to exhibit some symptoms. His wife experienced some health problems but not to the same degree or extent.

Appellant claims the feed supplement was responsible not only for the cattle's problems, but his own. Moe states that the feed killed rats and mice and that family pets fed meat scraps sickened and died. Initially, a contaminant such as PCB's was suspected as the "poison" but tests failed

to reveal dangerous concentrations of those toxic elements.

Further tests revealed the presence of 2, 3, 7, 8 TCDD (dioxin) in the feed as well as the meat. The feed tested at 13 parts per trillion (ppt). The meat was analyzed at 18 ppt in a hamburger sample, while 415 and 431 ppt were found in a piece of fat. Tests were also conducted on fat samples taken from Norman Moe. A test made by Wright State University (Ohio) found 10 ppt; the University of Nebraska discovered 15 ppt and 30 ppt.

Expert testimony exists to the effect that Mr. Moe's symptoms are consistent with dioxin exposure.

Professor Jeffrey Stevens of the University of Minnesota found:

3. That the detection of 13 parts per trillion of TCDD in the feed supplement is a positive finding. That such a level of TCDD in the feed supplement can produce a much higher level of TCDD in cattle which consume the feed supplement, and is therefore consistent with the detection of 415 parts per trillion in a beef sample. That it could be expected that an even higher level of TCDD would be found in the tissue of humans who consumed such beef. That TCDD is an extremely toxic element and its effect on human health would be consistent with symptoms exhibited by Norman Moe, including the diagnosis of an immune deficiency problem.

Dr. Paul Johnson of Occupational Health Services at St. Paul-Ramsey Medical Center stated:

My impression is that we have strong evidence that Mr. Moe was exposed to meat which was contaminated with 2, 3, 7, 8 TCDD. This is substantiated by the presence of measurable levels of this substance in cattle feed and the meat from these cattle which he states that he subsequently consumed. * * *

\* \* \* \* \* \*

Mr. Moe also relates a history that is certainly suggestive of clinical problems consistent with exposure to 2, 3, 7, 8 TCDD. The many subjective symptoms which he complained of, the fatty liver changes noted on two biopsies, and the abnormalities noted on EMG all are consistent with problems that could be expected in a person exposed to this substances.

\* \* \* \* \* \*

In summary I feel that Mr. Norman Moe has had exposure to beef which was contaminated with 2, 3, 7, 8 TCDD. This exposure has been documented. Mr. Moe has manifested health problems in the past which are consistent with human exposure to this substance.

An allergist also believed Moe's illness was consistent with exposure to "some toxic chemical."

Moe has a history of past health problems. Some of the symptoms he experienced after eating the meat had been experienced on prior occasions because of other chemical exposure. Some medical reports suggest a psychosomatic basis for his symptoms. Dr. Johnson touches on these problems as well as the general nature of his complaints.

The problem in this case is that although the exposure seems definite and documented, all of Mr. Moe's health complaints and abnormal findings which have been documented to this time, are extremely nonspecific, that is, although they could be produced by this specific chemical substance, they also could be manifestations of many other medical conditions.

There is no testimony as to symptoms experienced by Mrs. Moe and no tests or expert testimony substantiating her exposure to any chemical.

### ISSUE

Did the trial court err in granting respondent summary judgment on the personal injury claims?

### ANALYSIS

■ Pursuant to Minn.R.Civ.P. 56.03 respondent was granted a summary judg-

ment dismissing, with prejudice, the Moes' personal injury claims. Summary judgment is proper when no genuine issue arises as to a material fact. Normally, summary judgment should not be granted with regard to questions of negligence. *Kaczor v. Murrow*, 354 N.W.2d 524, 525 (Minn.Ct.App.1984). Negligence issues, such as proximate cause, are "usually a question of fact and seldom can be disposed of on a motion for summary judgment." *Hamilton v. Independent School District No. 114*, 355 N.W.2d 182, 184 (Minn.Ct.App.1984). Such factual questions, deducing causation for example, are the province of the factfinder, the jury. *Id.* at 185; *Illinois Farmers Insurance Co. v. Tapemark Co.*, 273 N.W.2d 630, 633–34 (Minn.1978).

Summary judgment is a "blunt instrument." *Larson v. Independent School District No. 314, Braham*, 312 Minn. 583, 586, 252 N.W.2d 128, 130 (1977). Summary judgment is proper if issues are shown to be a "sham, frivolous, or so insubstantial that trying them would be an exercise in futility." *Id.*

The facts of Mr. Moe's exposure to dioxin and his medical history are confused and indefinite. The exposure dates back to 1973–74, while the litigation has taken nearly 10 years to reach the pre-trial motion stage. However, the existence of doubts, even strong doubts, about the basis or potential outcome of a case must not influence a trial court's evaluation of the evidence. Appellant need only show sufficient evidence to raise a question of material fact. Although summary judgment questions have been compared to the directed verdict standard in that "(a) genuine issue must be established by 'substantial evidence' " the evaluations are not precisely analogous. *Louwagie v. Witco Chemical Corp.*, 378 N.W.2d 63, 68 (Minn.Ct.App. 1985).

Although the standards for summary judgment and directed verdict are similar, undue reliance on directed verdict cases when deciding a summary judgment motion is a mistake, especially when determining whether the evidence is "substantial." Directed verdict motions are appropriate only at the close of the evidence offered by an opponent or at the close of all the evidence. Minn.R. Civ.P. 50.01. Thus, the evidence available for review on a motion for directed verdict is typically much more complete than that available to the court on a summary judgment motion. Accordingly, the court in *Murphy* made clear that substantial evidence "refers to legal sufficiency and not quantum of evidence." *Id.* (citing *Murphy v. Country House, Inc.*, 307 Minn. 344, 352, 240 N.W.2d 507, 512 (1976)).

The possibility that proof problems may arise at trial cannot justify judicial preemption of appellant's opportunity to complete and present his case to the jury when preliminary evidence indicates dioxin a likely cause of Moe's illness even though a *precise*, demonstrable causal connection is still lacking.

If any doubt exists as to the existence of a material fact, the doubt must be resolved in favor of finding that the fact issue exists.

*Woody v. Krueger*, 374 N.W.2d 822, 825 (Minn.Ct.App.1985).

Appellants seek to recover damages under three different causes of action. The evidence indicates a plausible causal linkage between the contaminated feed supplement manufactured by respondent, Moe's cattle, the meat consumed by Moe, and the dioxin present in Mr. Moe's body fat sample. The plausible causal connection is sufficient for the different causes of action to proceed. For example,

The basic elements necessary to maintain a claim for negligence are (1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer injury.

*Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149, 157 (Minn.1982). The milling company's duty was to provide a safe food supplement free of toxic chemicals such as dioxin. With the establishment of that

duty, the plausible causal linkage between the supplement's dioxin to Moe's fat sample fulfills the remaining elements necessary to show negligence.

The demonstration of a sufficient causal connection to overcome a summary judgment motion with regard to negligence almost necessarily suffices for the strict liability and breach of warranty actions. For strict liability, appellants must show they were

(1) * * * injured by the product; (2) the product was in a defective condition unreasonably dangerous for its use; and (3) such defective condition existed when the product left the hands of the manufacturer.

*Farr v. Armstrong Rubber Co.*, 288 Minn. 83, 90–91, 179 N.W.2d 64, 69 (1970).

A preliminary showing of strict liability can be made since Moe's ill health is consistent with dioxin poisoning and dioxin is an artificial chemical which, according to appellant's evidence, can harm animals and perhaps humans if present in even minute amounts. Also, Moe took his testing samples from Springfield Milling Co. feed sacks so appearances indicate the defective condition existed when the feed left the manufacturer's hands.

Finally, a breach of warranty claim can be satisfied at this stage of the litigation.

To establish a warranty claim the plaintiff must basically prove: the existence of a warranty, a breach, and a causal link between the breach and the alleged harm.

*Peterson v. Bendix Home Systems*, 318 N.W.2d 50, 52–53 (Minn. 1982). The breach could involve an implied warranty that toxic chemicals—such as dioxin—will not be present in a feed supplement intended to produce healthy, marketable cattle.

### DECISION

Appellant Norman Moe has presented sufficient evidence to demonstrate a causal connection between the dioxin-contaminated feed and his health to overcome a summary judgment motion. No evidence has been presented substantiating Gene-

vieve Moe's claims and the summary judgment dismissing her claims with prejudice is affirmed.

Affirmed in part, reversed in part and remanded for trial.