Dale Wayne JONATHAN, Appellant,

v.

Daniel R. KVAAL, Doughboy Recreational, Respondents.

No. C6–86–1456.

Court of Appeals of Minnesota.

March 31, 1987.
Review Denied May 20, 1987.
Rehearing Denied June 30, 1987.

Leo F. Feeney, Corey L. Gordon, Robins, Zelle, Larson & Kaplan, St. Paul, for appellant.

James A. Reding, Richard S. Stempel, Reding & Votel, St. Paul, for Kvaal.

Paul C. Kunert, Sahr, Kunert & Tambornino, Minneapolis, for Doughboy Recreational.

## OPINION

FOLEY, Judge.

This case arises from a swimming pool accident that rendered appellant Dale Wayne Jonathan a quadriplegic. Jonathan sued the pool's manufacturer, respondent Doughboy Recreational, asserting strict liability, negligence and breach of warranty, and the pool's owner, respondent Daniel R. Kvaal, for negligence. Following cross-motions for summary judgment, the trial court entered judgment for Doughboy and Kvaal, finding Jonathan's injuries "were caused exclusively by his own negligence." Jonathan appeals. We reverse and remand for trial on all issues.

## FACTS

Jonathan was one of three tenants in Kvaal's home at the time of the accident in August 1980. The above-ground vinyl-lined swimming pool was located in Kvaal's back yard. A portion of the shallow end of the pool had been dug into an elevation in Kvaal's back yard, resulting in a shorter distance from ground to pool than at other points. Depth markers were placed at appropriate locations around the pool, which had a minimum depth of four feet and a maximum depth of seven feet. The pool also contained a sign warning against jumping and diving.

Jonathan used the pool on a regular basis, at least 10 times prior to the accident. Nighttime use was infrequent. Kvaal acknowledged by deposition that the pool was not directly lit at night; the only sources of illumination were a living room light that shown through a large picture window, a spotlight at the corner of the house, and a nearby street light.

Sometime in July 1980, Jonathan helped Kvaal completely dismantle, clean and reassemble the pool. Jonathan acknowledged by deposition that he was aware of the warning sign and the depth markers. He further acknowledged that he was familiar with the vinyl liner but stated that he was unaware of any dangers inherent in its use. On one occasion, Jonathan entered the pool from the roof of Kvaal's house. Kvaal, who was not present at the time, warned Jonathan not to do this again.

Events leading up to the accident are undisputed. On the night of August 24, 1980, Jonathan and another tenant, Jeff Nash, watched a football game at Kvaal's house. While watching the game, Jonathan consumed an unknown quantity of strong beer; he could not recall if he ate dinner. Around 10 p.m., Nash and Jonathan went to several local bars, where Jonathan continued to drink.

Nash and Jonathan then returned to Kvaal's house, where they were joined by friends, including Kvaal. By deposition, Jonathan stated that he jogged alongside the pool and dove over the side into the shallow end, where the pool had been partially dug into the ground. His hands were the first part of his body to enter the water. When Jonathan did not surface, a friend pulled him out. Since the accident, Jonathan has been a quadriplegic.

Jonathan admitted that he was "feeling loose" when he entered the pool. He could not recall whether the garage light that normally illuminated the pool was on at the time of the accident. Although Jonathan had approximately 20 years of swimming experience, he considered himself at most a "fair swimmer" with "no formal instruction." He had previously performed surface dives into the shallow end of the pool but denied having any expertise concerning particular types of dives or the risk of injury posed by these dives.

The record contains an uncontested affidavit by M. Alexander Gabrielsen, an expert in pool design, who stated that these types of pools create risks of injury well known in the pool industry but unknown to the general public. In entering summary judgment, the trial court essentially ignored this affidavit and concluded that Jonathan was "familiar with the pool" based on his frequent use and assistance in cleaning it, that he was "an experienced swim-

mer and diver" and that his injuries "were caused exclusively by his own negligence and not by any breach of duty" by Kvaal or Doughboy.

## ISSUE

Did the trial court err in concluding that Jonathan's negligence was the sole cause of his injury as a matter of law?

## ANALYSIS

■ On appeal from a grant of summary judgment, this court's "function is to determine whether any genuine issues of material fact exist and whether the trial court erred in its application of the law." *Poplinski v. Gislason*, 397 N.W.2d 412, 413–14 (Minn.Ct.App.1986), *pet. for rev. denied*, (Minn. Feb. 18, 1987). If there is any doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of finding that a fact issue exists. *Id.* at 414.

■ In *Poplinski*, this court stated that "summary judgment has been described as a 'blunt instrument' to be employed 'only where it is perfectly clear that no issue of fact is involved.' " *Id.* (quoting *Donnay v. Boulware*, 275 Minn. 37, 45, 144 N.W.2d 711, 716 (1966)). Appellate courts do not resolve or decide issues of fact but only determine whether there are issues of fact to be tried. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn.1981). "All doubts and factual inferences must be resolved against the moving party." *Id.* Summary judgment should not be granted if reasonable persons might reach different conclusions after reviewing the evidence. *Anderson v. Twin City Rapid Transit Co.*, 250 Minn. 167, 186, 84 N.W.2d 593, 605 (1957).

■ Applying the foregoing rules governing summary judgment to this case, it is clear that there are triable issues of fact for resolution by a jury. This is a products liability case involving the design of an above-ground swimming pool with a vinyl lining. Other claims are also added in negligence and failure to warn, but the main thrust of this appeal and of this opinion relates to a claim of defect in the design of the swimming pool.

A court may consider affidavits on file under Minn.R.Civ.P. 56.03. In this case, the unchallenged affidavit of Gabrielsen creates a disputed issue of material fact by asserting that the design of the pool, and in particular the vinyl flooring of the pool, substantially contributed to Jonathan's injuries:

> In the instant case, a portion of the pool was dug-in encouraging head-first entries from ground level at that point. *Any pronated head-first entry poses a risk of serious injury to all swimmers, which exposure was not known to the general public. This risk was not portrayed or warned against by the swimming pool industry but was well known within the industry, i.e., swimming pool manufacturers, including Doughboy, prior to August 24, 1980.*

> \*　\*　\*　\*　\*　\*

> Prior to August 24, 1980, numerous studies had been conducted concerning aquatic safety and swimming pool design and construction. These studies were well known within the swimming pool manufacturing industry (herein "Industry"). \* \* \* Based on the empirical results of these studies, the Industry was aware, prior to August 24, 1980, that head-first entry into above-ground swimming pools was the major cause of severe injuries arising out of pool activities. These studies substantiated that angle entries of greater than 30 degrees, coupled with a straight body alignment, caused the swimmer to interact with the bottom of the pool in a hazardous manner. *The design of these pools, including the subject pool, does not safely accommodate any manner of pronated or head-first entry into the above-ground product.*

> \*　\*　\*　\*　\*　\*

> Any time a swimmer executes a pronated or head-first entry into a body of water, there is both a horizontal and vertical movement (upward) of the center

of mass.  * * * the more athletic an individual is, the higher and longer the trajectory through the air is likely to be. Thus, the more athletic the individual, the greater the risk of injury. *This is in distinct contrast to the commonly held belief of the general public that the better shape one is in, the safer one will be in engaging in athletic activities such as swimming.*

* * * The untrained swimmer with athletic ability believes that he is in control of his head-first entry. However, the law of physics and not the person control a given entry once the swimmer is airborne. These laws are not fully predicted by the individual, and when he leaves the surface and commits himself to the air, the direction, trajectory and velocity of the entry pass out of his control. *To further skew the swimmer's misconception about his control is the fact that the swimmer's water entry velocity will vary each time depending upon the height he obtains and his angle of entry into the water.*

(Emphasis supplied.)  Despite these unchallenged statements, the trial court ruled that Jonathan was the sole proximate cause of his injuries as a matter of law. In view of these statements causally linking admitted product defects and insufficient warnings with Jonathan's injuries, it cannot be said that only one conclusion as to causation exists. Summary judgment on Jonathan's strict liability count therefore was inappropriate.

█ Moreover, by conceding (for purposes of summary judgment) that defects in the design of the pool existed and that its warnings were insufficient, Doughboy has acknowledged the existence of a duty owed to Jonathan and a breach of that duty. This is relevant in assessing Jonathan's negligence claim against Doughboy. A plaintiff need only demonstrate a "plausible causal linkage" between a breach of duty and his or her injuries to allow a claim

of negligence to be presented to a jury. *Moe v. Springfield Milling Corp.*, 394 N.W.2d 582, 585–86 (Minn.Ct.App.1986), *pet. for rev. denied*, (Minn. Dec. 17, 1986).

The trial court and now the dissents rely on *McCormick v. Custom Pools, Inc.*, 376 N.W.2d 471 (Minn.Ct.App.1985), *pet. for rev. denied*, (Minn. Dec. 30, 1985). This reliance is misplaced. To rely on *McCormick* is to rely on *Magnuson v. Rupp Manufacturing, Inc.*, 285 Minn. 32, 171 N.W.2d 201 (1969), for the rule that if one is aware of the danger in the use of the product, there is no liability. Neither *McCormick* nor *Magnuson* is applicable here (although each included a claim of defect in design), and both cases are distinguishable in light of *Holm v. Sponco Manufacturing, Inc.*, 324 N.W.2d 207 (Minn. 1982).[1]

The plaintiff in *Holm*, an experienced electrician's assistant, stipulated that danger of electrocution from contact with a high voltage wire was obvious, that he in fact knew of this danger based on prior experience and that he was familiar with the warning decals on the machine warning against the specific hazard that caused the injury. The court nevertheless reversed a grant of summary judgment to the manufacturer and held that the plaintiff could proceed to trial on both his strict liability and negligence claims.

In *Holm*, the Minnesota Supreme Court very carefully reviewed the development of the doctrine of obviousness of product dangers as a bar to recovery. In particular, the court reviewed the case of *Halvorson v. American Hoist & Derrick Co.*, 307 Minn. 48, 240 N.W.2d 303 (1976), where the supreme court "appeared to have adopted the latent-patent danger rule which relieves a manufacturer from liability if the dangers of his product are obvious to the user." *Holm*, 324 N.W.2d at 209–10.

█ The court rejected the latent-patent defect rule set out in *Halvorson* and

**1.** Decision was reached in *McCormick* by this court without reference to *Holm*. Dissents were filed by Judges Crippen and Parker, who concluded that summary judgment was inappropri-

ate because the record contained an affidavit of an expert which created fact issues regarding the cause of the injuries. *McCormick*, 376 N.W.2d at 478–79.

adopted the "reasonable care test" followed in New York and Florida. This current trend in products liability as summarized by the Florida Supreme Court is quoted as follows:

> The modern trend in the nation is to abandon the strict patent danger doctrine as an exception to liability and to find that the *obviousness* of the defect *is only a factor* to be considered as a mitigating defense in determining whether a defect is unreasonably dangerous and whether plaintiff used that degree of reasonable care required by the circumstances.

*Holm,* 324 N.W.2d 211 (quoting *Auburn Machine Works Co., Inc. v. Jones,* 366 So.2d 1167, 1169 (Fla.1979)) (emphasis supplied).

■ A manufacturer in Minnesota is no longer relieved of liability under the latent-patent defect rule simply because dangers associated with the product are obvious to the user. In its place the supreme court substituted a balancing test in the "same manner that the courts of New York and Florida have done." *Holm,* 324 N.W.2d at 213. Such a test is set out by the New York Court of Appeals as follows:

> [A] manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonable foreseeable use.

> What constitutes "reasonable care" will, of course, vary with the surrounding circumstances and will involve "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm.

*Holm,* 324 N.W.2d at 212 (quoting *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 385–86, 384 N.Y.S.2d 115, 120–21, 348 N.E.2d 571, 577–78 (1976) (citations omitted)).

Of even more significance to this case is *Holm*'s reliance on *Ferguson v. Northern States Power Co.,* 307 Minn. 26, 239 N.W.2d 190 (1976), decided a week before *Halvorson.* In *Ferguson,* a teen-aged boy was severely injured when he accidentally contacted an 8,000 volt uninsulated electrical transmission line while trimming a tree. The court refused to bar recovery in absence of proof that the plaintiff was negligent in the face of a *known* danger. Thus, in *Ferguson,* "while the *danger* was obvious, the *extent* of danger was not." *Holm,* 324 N.W.2d at 210 (emphasis in original).

That is the key here—Jonathan's knowledge of the *extent* of danger in use of the pool. The dissents do not recognize that in adopting a reasonable care standard the supreme court minimizes the significance of obviousness of danger to but a *factor* in determining liability. Because the dissents place such emphasis on *McCormick,* we distinguish that case on the facts, quite apart from the controlling law of *Holm.*

In *McCormick,* the plaintiff was an "experienced" swimmer by his own admission. Here, Jonathan considered himself at most a "fair swimmer" with "no formal instruction". Further, in *McCormick,* the plaintiff knew that a "body surface dive" was necessary in view of the height of his entry and depth of the water in the pool; by implication, he knew that failure to perform the dive in this manner could result in injury. Thus, the manufacturer's alleged failure to warn the plaintiff in *McCormick* of the dangers he already knew could not have been the proximate cause of the injury.

Moreover, in contrast to *McCormick,* the swimming pool at issue here was an aboveground variety. According to Gabrielsen, *the general public was unaware* that pronated head-first diving *in above-ground* pools posed a risk of serious injury. Unlike the plaintiff in *McCormick,* Jonathan stated that he was unaware that he was risking serious injury by entering the pool from ground level as he did the night of the accident:

> I had no idea [at the time of the accident] that I could be hurt in any way using that pool. I also had no idea that there was any risk in using that pool * * * and

I had *no idea that there was any risk of any kind entering the pool that way.* Because of the accident I became a quadriplegic and at that time there was no conception in my mind that this could possibly happen * * *.

(Emphasis supplied.)

Jonathan's awareness of the alleged design defects in this case, notably the vinyl liner, is glossed over by the dissents in an apparent attempt to fit the issue neatly within the confines of *McCormick*. This ignores Jonathan's lack of knowledge as to the extent of danger. This view also ignores Gabrielsen's statements regarding the dangers associated with diving into a pool with a vinyl liner, dangers which were known by the swimming pool industry, but not by the general public.

Under normal circumstances, a swimmer executing a head-first entry into water of limited depth is afforded some protection against serious spinal injuries because his outstretched hands and arms will make contact with the bottom and redirect his trajectory due to the presence of friction so as to minimize or avoid contact with the bottom. The coefficient of friction of the [pool] manufactured by defendant Doughboy was inadequate to provide sufficient protection against sliding, and [this inadequacy] was known to the Industry prior to August 24, 1980.

The dissents apparently conclude or at least imply that since Jonathan was aware of the *existence* of the vinyl liner, by virtue of his prior use of the pool and his participation in dismantling and reassembly of the pool, he was also aware of the *danger* occasioned by use of this liner. This analysis is flawed, for "[p]ast experience with a product, * * * does not necessarily alert users to all of the dangers associated with the product." *Willmar Poultry Co. v. Carus Chemical Co.*, 378 N.W.2d 830, 835 (Minn.Ct.App.1985), *pet. for rev. denied,* (Minn. Feb. 14 and 19, 1986) (knowledge of some of the risks involved with fumigation based on previous experiences did not extend to large scale fumigations and *"at least raised a question of fact for the jury*

*to determine"*). Here, Jonathan's knowledge as to the extent of the danger in using the pool is a fact issue for the jury. Here, our analysis is not limited to questions of breach of duty only but involve, as well, issues of causation, for liability does not arise unless and until there is a breach of duty that is a direct cause of injury. These are triable issues of fact not to be resolved by summary judgment.

■ The dissents' reasoning is troublesome in another respect. The level of Jonathan's intoxication on the night of the accident also relates to causation. Whether or not his condition contributed to his injuries and to what extent is an issue for the trier of fact and ultimately a factor to be considered in assessing comparative fault. *See* Minn.Stat. § 604.01 (1980). Again, to suggest otherwise is to ignore comparative fault, and our task in reviewing summary judgment is to determine if there are triable issues of fact, not to resolve them.

■ Genuine issues of material fact also exist with regard to allegations of negligence and causation on the part of Kvaal. Of particular importance is the allegation that Kvaal failed to adequately light the pool on the night of the accident. As stated by Gabrielsen:

The difficulties in assessing where you are in space and in a swimming pool (by the swimmer) are substantially increased when the lighting is inadequate. Accordingly, *it is unreasonable for an owner of a swimming pool to encourage individuals to use the swimming pool at nighttime without adequate artificial illumination directly on the pool area. This inadequate illumination makes it more difficult for the entrant to discern the approaching bottom of the pool. In the instant case the home owner did not provide adequate illumination.*

(Emphasis supplied.) This issue is also for the jury to decide.

Finally, resolution of all issues against the manufacturer, the property owner and the injured party will "depend largely on

the scope of evidence admitted by the trial court and on the jury instructions given under each theory." *Bilotta v. Kelley Company, Inc.*, 346 N.W.2d 616, 622 (Minn.1984). *See Mix v. MTD Products, Inc.*, 393 N.W.2d 18, 20 n. 2 (Minn.Ct.App. 1986).

## DECISION

It was error to grant summary judgment. Judgment is reversed and the case remanded for trial on all issues against Doughboy and Kvaal.

Reversed and remanded.

RANDALL, Judge (dissenting).

I respectfully dissent. I would have affirmed the trial court's decision to grant summary judgment to respondents.

Appellant was one of three roomers in respondent Kvaal's house. He moved into Kvaal's house in June 1980, and, in fact, stayed there fairly regularly before he formally moved in. Appellant had a lengthy and complete familiarity with the pool in question.

In his backyard, Kvaal had an above ground swimming pool, manufactured by respondent, Doughboy. The pool was twelve feet wide and thirty-six feet long. The minimum depth was four feet, maximum depth was seven feet. A ten to twelve foot wide deck ran along one side of the pool, and a ladder ran from the pool to the deck. The pool was about eight inches higher than the deck. A portion of the pool had been dug into an elevation in Kvaal's backyard. The pool had placards at appropriate locations indicating depths of four feet and seven feet. The pool also bore a warning sign stating, "no jumping/no diving."

Sometime in mid-July 1980, Kvaal and appellant took the pool completely apart and cleaned it. They drained most of the water out of the pool, bailed out the rest, removed and cleaned the liner, and they reassembled the pool. Appellant helped remove and replace the depth markers and the "no jumping/no diving" sign when he

and Kvaal cleaned the pool. Appellant conceded in his deposition testimony that he was aware of the pool depth at all levels, was aware of the depth markers, knew the shallow end from the deeper end, and was aware of the warning sign that said "no jumping/no diving." Appellant helped Kvaal clean the pool on a regular basis, and used the pool on a regular basis.

On the night of August 24, 1980, appellant and a friend, Jeff Nash, watched a Vikings football game at Kvaal's house. While watching the game, appellant consumed an unknown quantity of strong beer, more than one can, but less than six. Appellant does not recall if he ate dinner. Around 10 p.m., after the Vikings game ended, Nash and appellant went to the Red Rooster Bar, where appellant consumed more beer. He could not recall how much he consumed there, but it could have been more than six beers. Appellant and Nash left the Red Rooster with two women around 12:45 a.m. From the Red Rooster, the women followed appellant and Nash to Timothy O'Toole's Bar and to Jethro's Bar. Appellant had at least one beer at Jethro's and cannot recall what he had to drink, if anything, at Timothy O'Toole's. Appellant consumed no food during this time.

The two women followed Nash and appellant back to Kvaal's house. Kvaal, two other men, and one women were already at Kvaal's house. After talking to Kvaal and another man in the kitchen, appellant stripped off all his clothes, ran out of the house, through the garage, and leaped over the side of the pool into the shallow end. He attempted to do a surface dive. In his deposition, appellant admitted that he was feeling loose or a little intoxicated when he dived into the pool. From that point on, there are no witnesses who can testify to precisely what happened underwater, but both sides assume that appellant came in contact with the bottom of the pool. Although the two women were apparently in the area, no one actually saw appellant strike the bottom of the pool. Appellant lost consciousness after he hit the water and awoke in St. Paul Ramsey's intensive care unit. Appellant did not surface imme-

diately. When this was noticed, appellant was pulled out of the pool. It was later discovered that he had sustained a neck injury and is now a quadriplegic as a result.

Appellant could not recall exactly whether the garage light that normally illuminated the pool was on at the time of the accident. Kvaal's deposition indicated that the pool area was also illuminated by a nearby street light and by a light shining through Kvaal's dining room window.

Prior to the accident, after moving in with Kvaal, appellant swam in the pool nearly every day. He used the pool at least ten times before moving in with Kvaal, and had previously used the pool at night. The pool was last cleaned about a week before the accident, but some algae had formed at the time of the accident. Appellant, in resisting summary judgment, attempted to argue that there is a genuine issue of material fact as to the illumination around the pool, or lack of it, and the discoloration of the water, if any. However, there is no evidence in the record, nor even a claim by appellant, that had there been one more flood light above the pool, or had the pool been cleaned the day before rather than about a week before, that anything would have been different. Appellant did not base his intention to deliberately dive into the shallow end of the pool on any claim that he was mistaken as to where he was or what he was doing. His uncontroverted intention was to dive head first into that pool at the place that he did, knowing full well in advance what the exact depth of the water was where he went in.

Appellant, 24 years old at the time of the accident, had approximately twenty years of swimming experience. He was familiar with the concept of diving into backyard pools, and had previously done surface dives into the shallow end of this pool. Sometime prior to the accident, appellant had jumped into the pool from the nearby garage roof and had been warned by Kvaal not to do that any more.

On these facts, the trial court ruled in favor of respondents Kvaal and Doughboy on their motion for summary judgment. In its order dated May 30, 1986, the trial court made the following findings of fact:

At about 1:00 A.M. Sunday, August 24, 1980, plaintiff Jonathan, who was then 24 years old, was present at a gathering in defendant Kvaal's house. There were ladies present. Plaintiff, who had been drinking, abruptly stripped off all his clothes and ran through the dining room and out of the house into the back yard.

In the back yard was an above-ground swimming pool manufactured by defendant Doughboy. Without breaking stride, plaintiff ran across the back yard and took a flying leap off the ground and over the side of the pool, entering the water head first.

Plaintiff sustained a sprained neck and is a quadriplegic.

During the two months before his injury plaintiff had entered the pool several times head first. He was familiar with the pool and had swum in it on an almost daily basis. He had also taken the pool apart and cleaned it. Plaintiff knew the water in the pool was only four feet deep at the shallow end into which he jumped.

On one occasion plaintiff had jumped from the roof of the Kvaal garage into the shallow end of the pool. Defendant Kvaal, who was not home at the time, warned plaintiff never to do that again.

At the time of plaintiff's injury, there were three signs on the Doughboy pool. The signs stated "4 feet", "7 feet", and "No Diving."

Plaintiff was an experienced swimmer and diver.

Plaintiff's injuries were caused exclusively by his own negligence and not by any breach of duty by defendants Kvaal or Doughboy.

In its conclusions of law, the trial court found:

Defendants are entitled to summary judgment in their favor, dismissing the complaint with prejudice and without costs to either party. See *McCormick v.*

*Custom Pools, Inc.*, 376 N.W.2d 471 (Minn.App.1985).

The question before this court on appeal is whether the trial judge erred as a matter of law in granting summary judgment to either or both respondents. The trial court cited *McCormick v. Custom Pools, Inc.*, 376 N.W.2d 471 (Minn.Ct.App.1985), *pet. for rev. denied*, (Minn. Dec. 30, 1985).

It is difficult to distinguish this case from *McCormick*. The facts here are stronger to support the trial court's grant of summary judgment than in *McCormick*. McCormick had done no drinking prior to his incident. McCormick was using his friend's swimming pool during the early evening for swimming and diving purposes. McCormick was acting naturally at the time, had made a rational and voluntary decision to dive into the shallow end of the pool, and assumed he would surface at the deep end unharmed. McCormick did not contribute to his own injuries in the rash and thoughtless way that appellant did. Yet, as to *McCormick*, a grant of summary judgment against him by the trial court was affirmed on appeal.

The operative facts in *McCormick* are similar to those before this court now. McCormick became a quadriplegic when he attempted a flat surface dive into the shallow end of a swimming pool and struck his head on the pool bottom. He had dived into the pool before, and he knew the depth of the water at the point where he dove. He knew he had to execute a surface dive to avoid injury. I note that in *McCormick* the pool did not bear explicit depth markers and the warning sign against diving that appellant here concedes were present.

Issues of negligence and proximate cause are seldom capable of determination on a summary judgment motion. However, summary judgment is appropriate where material facts are not in dispute and compel only one conclusion. *McCormick* at 475. *See Vanderweyst v. Langford*, 303 Minn. 575, 576, 228 N.W.2d 271, 272 (Minn. 1975) (Only where evidence is so clear and conclusive as to leave no room for differences of opinion among reasonable men

that the issue of causation becomes one of law to be decided by the court.)

Appellant's claims against Doughboy are predicated on negligence, warranty, and strict liability. The claims against Kvaal are predicated on negligence. For the limited purpose of the motion for summary judgment, respondents admitted the instructions and warnings were insufficient, and that there were design defects in the pool and vinyl liner. Respondents wanted to frame the issue so there would be no dispute over material facts, and then argued that, as a matter of law, they were entitled to summary judgment. The trial court agreed and, even with the tragedy of the accident, I cannot disagree.

The majority spends its time attempting to distinguish *McCormick* on the facts and rests on *Holm v. Sponco Manufacturing, Inc.*, 324 N.W.2d 207 (Minn.1982), and *Ferguson v. Northern States Power Co.*, 307 Minn. 26, 239 N.W.2d 190 (1976). An examination of *Holm* and *Ferguson* shows that they are actually distinguishable from the swimming pool/dive cases of *McCormick* and this case because, in *Holm* and *Ferguson*, the operative word is "accident." Holm, an electrician's assistant, was familiar with the danger of working with high voltage power lines from an aerial ladder and was doing his utmost to be cautious and avoid the electrical power line that caused his injuries. While so being cautious in attempting to avoid the power line, Holm accidentally struck the electrical power line with his right arm below the shoulder. The facts in *Holm* would only be precedent for the facts in this case if Holm, on a dare or in an attempt to show off, had intentionally grabbed the power line while on his aerial ladder mistakenly believing he was insulated and could get away with grabbing the line without injury. Those are not the *Holm* facts. Holm accidentally touched the power line.

Here, however, appellant, like in other swimming pool/dive cases, intentionally dived into the shallow part of a familiar pool. Appellant, unlike Holm, was not being extremely cautious trying to avoid acci-

dentally falling into the shallow end of the pool. Appellant intentionally dove into the shallow end.

The same is true of *Ferguson.* The operative concept is that Ferguson *accidentally* contacted a high voltage electrical transmission line, which caused his injuries. Appellant, on the other hand, intentionally dove into the shallow end of the pool mistakenly assuming that he could pull it off safely. Had Holm and Ferguson *intentionally reached out and grabbed the electrical lines which caused their injuries,* mistakenly believing they could to so without injury, I suspect the result in *Holm* and *Ferguson* would have been different.

The majority places emphasis on the fact that the expert Gabrielson's last affidavit on behalf of appellant did not bring forth a responsive affidavit from respondents. The majority finds that therefore, since the affidavit was "unchallenged," its statements thereby create genuine issues of material fact pursuant to Minn.R.Civ.P. 56.03.

I am not sure of the majority's reliance on its claim that, since Gabrielson's affidavit was "unchallenged," it has extra meaning in negating the appropriateness of summary judgment. Had respondents filed a counter affidavit, the majority would then argue that, since there are conflicting affidavits, therefore now there must be a genuine issue of material fact and the case is still not ripe for summary judgment. In other words, under the majority's logic, if Gabrielson's affidavit did not bring forth a responsive affidavit, there must be a contested material fact issue, and if Gabrielson's affidavit had brought forth a responsive affidavit, there must be a contested material fact issue.

Although it is true that negligence and products liability cases are not often appropriate for summary judgment, there is nothing in Rule 56, or in any case of the Minnesota Supreme Court, which prohibits the use of Rule 56 in these cases. As the bench and bar who work in the personal injury field know, if all one had to do to escape a Rule 56 motion in a personal injury case was to find an expert with a "theory," Rule 56 would be written out of the law. An examination of the annotations and comments of Rule 56 and the cases decided thereunder, where summary judgment was affirmed, shows that the losing party had at least a "theory" in every case. Conflicting theories are found by looking.

In this case, to combat respondents' motion for summary judgment, appellant's expert claims the bottom of the pool was too slippery. In *McCormick,* the plaintiff's expert, in an attempt to escape summary judgment, claimed that the bottom of the pool was not slippery enough.

> *Zero slope* is a distinct hazard in terms of anticipated bather expectation, impact degree and *sliding safety* upon mild impact with the bottom.

*McCormick* at 474 (emphasis in original).

Appellants' expert claims that a diver does not want to slide upon a collision with the bottom of the pool. He rests this assertion on the theory that, when a person dives, his hands enter the water first. Thus, if his hands hit the bottom of the pool and did not slide, they would absorb the impact and his injuries would be limited to his hands and wrists rather than head and neck. Appellant's expert claims this is the causal link, and the majority accepts that theory.

Examining the record, I find there is not one shred of evidence put forward by appellant to show that the following sequence took place: appellant dove into the pool; appellant's hands struck the bottom of the pool first; appellant's hands slid away because the vinyl liner is slippery; appellant's head then came in contact with the bottom of the pool, causing the injuries; and, *but for* that particular Doughboy liner, appellant's hands would have braked his dive, and his collision with the bottom of the pool would have involved only his hands, not his head and neck.

That is the essence of appellant's theory in this case. However, it is theory only. Appellant produced no facts, either uncontroverted or in dispute, that this sequence is, in fact, what took place. Rule 56 speaks to genuine issues of material fact, not

merely conflicting theories or theories of recovery. Appellant produced only a theory, but no facts, to support the claim that Doughboy's vinyl liner was *causally* related to appellant's injuries. Appellant, to escape summary judgment, can only speculate as to how the incident occurred. The trial court found no causation and, upon review of the record, I cannot.

The majority opinion discusses appellant's level of intoxication as if the *level* of intoxication is a material fact dispute. This is not a DWI or an implied consent case. There likely is a factual dispute as to whether appellant had between six and nine total drinks that night, or between seven and ten, or between five and eight, et cetera. The number of drinks is not what this case is about. What is uncontroverted and what the trial court took from the record is appellant's concession that, prior to his injuries, he voluntarily drank a fairly large amount of alcohol, and that alcohol clouded his judgment. There is no need here for a jury to determine whether appellant's blood alcohol concentration was more or less than .10.

The problem with this case is not the facts but the injuries. There can be nothing more tragic than quadriplegia, for the sufferer, his family, and his friends. The easiest and most natural inclination for a trial court in a swimming pool/dive case is to "give the plaintiff a day in court," knowing that if the plaintiff's case has no merit, a miscarriage of justice can be prevented because defendant has the right to move for a directed verdict, either during the trial, before submission to a jury, or after an adverse verdict before appeal. The trial court here made the decision not to send the case along to see what appellant might be able to put together during his case in chief. The trial court reviewed the entire record, the affidavits, the experts' claims, the parties' depositions setting forth the facts surrounding the incident, and it then made the hard decision that summary judgment was appropriate. The easier decision perhaps would have been to send it on to trial, but that decision was not made. Sitting as an appellate court of review, and

sympathetic to appellant's severe injuries, I conclude that the trial court's assessment of no genuine issues of material fact was correct.

The facts here set out an even stronger case for summary judgment in respondents' favor than does *McCormick*. If the majority wants to carve out an exception for diving into backyard swimming pools, and hold that these cases can never be the subject of a Rule 56 motion, unlike other product liability cases, the proper course might be to ask the supreme court to accept this case, affirm it, and overrule *McCormick*. That would end uncertainty among the bench and bar. If all that is needed in a backyard swimming pool/dive injury case to defeat a motion for summary judgment is a "theory," it is inconceivable that there would ever be a case without one.

HUSPENI, Judge (dissenting).

I concur with the dissent that the trial court's award of summary judgment should be affirmed and that the facts here support a summary judgment for respondents even more strongly than the facts presented in *McCormick v. Custom Pools, Inc.*, 376 N.W.2d 471 (Minn.Ct.App.), *pet. for rev. denied*, (Minn. Dec. 30, 1985). However, I would analyze the nonapplicability of *Holm v. Sponco Manufacturing, Inc.*, 324 N.W.2d 207 (Minn.1982), and *Ferguson v. Northern States Power Co.*, 307 Minn. 26, 239 N.W.2d 190 (1976), differently.

In order to recover under a theory of strict liability arising from a defective product, a plaintiff must establish:

(1) that the defendant's product was in a defective condition unreasonably dangerous for its intended use, (2) that the defect existed when the product left the defendant's control, and (3) that the defect was the proximate cause of the injury sustained.

*Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 623 n. 3 (Minn.1984) (citing *Lee v. Crookston Coca-Cola Bottling Co.*, 290 Minn.

321, 329, 188 N.W.2d 426, 432 (1971)). For the purposes of the summary judgment motion at issue here, respondents admit the existence of design defects and insufficient warnings. Therefore, the only issue before the trial court was the issue of proximate cause.

Proximate cause is a separate factor in assigning tort liability. *Thorn v. The Glass Depot*, 373 N.W.2d 799, 803 (Minn. Ct.App.), *pet. for rev. denied*, (Minn. Nov. 1, 1985). The trial court recognized the separate proximate cause requirement and found as a matter of law that appellant's injuries were "caused exclusively by his own negligence" and not by negligence or breach of duty by respondents.

In contrast to this case, the issue raised in *Holm* did not involve causation, but was

> whether the manufacturer of an aerial ladder in a defective condition unreasonably dangerous to the user is liable to the user if that defective condition is obvious.

324 N.W.2d at 209. *See also Bilotta*, 346 N.W.2d at 621. In *Holm*, the court held that a manufacturer was not relieved of its duty to consumers because a product's defect was obvious, reversing prior case law that barred recovery when the defect was either obvious or known to the consumer. 324 N.W.2d at 213. In *Ferguson*, the issue raised involved the comparative negligence of the parties, not causation. 307 Minn. at 33, 239 N.W.2d at 194.

Respondents here do not contend that they should be relieved of any duty that may arise because of appellant's knowledge of the alleged defect in the swimming pool. They concede the duty, the defect and the negligence. I conclude that inasmuch as in the instant case all negligence and defect issues are resolved against respondents and the only issue is that of causation, neither *Holm* nor *Ferguson* are on point.

The trial court here found that regardless of a breach of duty by respondents, as a matter of law the injury was caused by appellant's negligence in diving into the pool and not by any act or omission of respondents. As in *McCormick*, the sole question presented to the trial court and to this court was one of causation. The appellant's injuries are devastating, but I must conclude that the trial court was correct in its determination that appellant's injuries were "caused exclusively by his own negligence."

POPOVICH, Chief Judge (dissenting).

I concur with the dissents of Judge Randall and Judge Huspeni.

I am additionally concerned, however, that the majority have made no substantial distinction between the facts in *McCormick* and the facts in this matter because they cannot. *McCormick*, a 4–3 decision of this court, was reviewed by the Minnesota Supreme Court. The petition for review was denied, which resulted in affirming this court and upholding a summary judgment against the plaintiff. The supreme court's action must mean something. The majority ignores that supreme court action and now reverses the trial court in this matter, which had relied upon *McCormick*. This 7–5 decision results in two inconsistent opinions involving substantially the same facts and issues. A dissent in *McCormick* now becomes the law in the case without overruling *McCormick*.

The supreme court should review this matter so the bench and bar will not be misled by this court's handling of two similar cases in what appears to me to be an inconsistent manner.

WOZNIAK, Judge, dissenting.

I concur in the dissent of Judge Randall.

FORSBERG, Judge, dissenting.

I concur in the dissent of Judge Randall.