[No. C040177. Third Dist. Nov. 8, 2004.]

LEESA BUNCH, a Minor, etc., Plaintiff and Respondent, v.
HOFFINGER INDUSTRIES, INC., et al., Defendants, Cross-Defendants and
Appellants;
McMASKER ENTERPRISES, INC., Cross-Complainant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts IV, V, and VI of the Discussion.

**COUNSEL**

Finley and Buckley, Timothy J. Buckley III, Chad D. Graddy, Dennis A. Brown III; Foley & Lardner and Robert J. Wenbourne for Defendants, Cross-Defendants and Appellants.

James A. Henderson, Jr., and Aaron D. Twerksi for Aqua Magazine as Amicus Curiae on behalf of Defendants, Cross-Defendants and Appellants.

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen, C. Athena Roussos; Charter Miller Davis and Whitney Davis for Plaintiff and Respondent.

Jeffrey G. Nevin Law Corporation and Jeffrey G. Nevin for Cross-Complainant and Respondent.

---

**OPINION**

**RAYE, J.**—One hot summer day, 11-year-old Leesa Bunch (Bunch) dove into a four-foot deep, aboveground swimming pool and changed her life forever. Rendered quadriplegic by the dive, Bunch eventually filed suit against, among others, defendants Hoffinger Industries, Inc., doing business as Doughboy Recreational Company, and Golden West Marketing, Inc. (collectively Hoffinger). Hoffinger manufactured the replacement pool liner used in the pool. Bunch also sued cross-complainant McMasker Enterprises, Inc. (McMasker), the seller of the liner. McMasker eventually settled with Bunch.

Bunch's complaint alleged negligence, products liability, failure to warn, and breach of warranty. A jury awarded Bunch over $12 million and awarded McMasker $1 million on its indemnity claim. Hoffinger appeals, contending: (1) it owed no duty to warn of possible injury from the obvious danger of diving into a shallow aboveground pool, (2) the court misapplied the doctrine of primary assumption of risk, (3) Hoffinger's acts or omissions were not the proximate cause of Bunch's injury, (4) the court erred in admitting evidence of prior accidents involving Hoffinger pools, (5) the trial court erred in failing to bifurcate the liability and damage phases of the trial, and (6) the court

violated Hoffinger's due process rights in refusing to admit evidence of McMasker's default judgment and refusing to enforce Bunch's covenant not to sue. Finding no error, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Preliminaries*

Bunch suffered her catastrophic injuries in August 1993. She filed suit against various corporate entities, including McMasker, alleging negligence, strict products liability manufacturing defect, strict products liability design defect, failure to warn, and breach of warranty, and requesting punitive damages. McMasker failed to respond, and in August 1998 the court granted Bunch's request for a default judgment against McMasker in the amount of $20,001,157.

After Bunch informed McMasker's insurer of the default judgment, McMasker brought a motion for relief from the default judgment. Subsequently, McMasker abandoned the motion and pursued settlement negotiations with Bunch.

McMasker tendered both the defense and indemnity of the action to Hoffinger; Hoffinger declined to participate. Hoffinger also opted out of McMasker's settlement negotiations with Bunch. McMasker filed a cross-complaint for indemnification against Hoffinger.

During settlement negotiations, Bunch agreed to set aside the McMasker default judgment and settle her claim against the company for $1 million, the limit of McMasker's insurance policy. Bunch also agreed not to sue Hoffinger, the target of McMasker's indemnity cross-complaint.

After settling with McMasker, Bunch requested that McMasker waive her agreement not to sue Hoffinger. McMasker agreed to waive the agreement not to sue. Accordingly, Bunch amended her complaint to substitute the Hoffinger parties as Doe defendants.

*Motion for Summary Judgment*

Hoffinger filed a motion for summary judgment. Prior to trial, the court heard oral argument on the motion. The court found the central issue to be the adequacy of the warning provided by Hoffinger with its pool liners. The court queried whether the danger of diving into an aboveground swimming pool was obvious to an 11-year-old child. The court further questioned whether Hoffinger discharged its duty to warn by placing warning labels in

the pool liner package with instructions for the consumer to affix them to the sides of the installed liner. Finding these issues raised questions of fact, the court denied Hoffinger's summary judgment motion.

*Pretrial Motions*

Hoffinger also filed a motion to dismiss Bunch's complaint, arguing the complaint was filed in direct opposition to the terms of her settlement with McMasker. The court denied the motion.

Hoffinger moved to bifurcate the trial, separating the liability and damage determinations. The court denied the motion, noting multiple witnesses would be testifying regarding both aspects of the trial, resulting in the same evidence being presented twice.

*The Trial*

A 17-day jury trial followed. The jury heard testimony about Bunch's fateful dive and Hoffinger's warning labels, and heard expert testimony regarding the efficacy of warning labels on the minds of children.

*The Accident*

Bunch's brother Erick rescued his sister from the bottom of the pool following her dive. According to Erick, who was nine years old at the time, he saw no warning labels on the pool. Loretta Frank, the owner of the pool, had told them not to dive on a previous visit. She did not tell them why they should not dive and did not repeat the warning the day of the accident.

Another child, Tyler Breeding, dove into the pool. Breeding performed a shallow dive, diving straight out into the water. He dove from the bench located on the deck adjacent to the pool.

Bunch also dove at least once before the dive that led to the accident. Erick did not see Bunch's final dive, but he heard the splash and saw her curled up and floating in the middle of the pool. Bunch whispered she could not breathe, and Erick dragged her to the edge of the pool.

Loretta Frank testified about the pool and the accident. Sometime between 1988 and 1990, she and her husband, Joe Frank, received a used frame for an aboveground swimming pool as a gift. The pool frame measured 33 feet long, 18 feet wide, and four feet high. Since the vinyl pool liner had rotted, the Franks purchased a new one from McMasker, a swimming pool supplier doing business as Waterworks. Hoffinger manufactured the liner.

Mr. Frank erected the frame and installed the replacement liner. He recessed the pool about two feet into the ground. Mr. Frank built an adjacent deck at the level of the top of the pool frame and built wooden benches on the deck next to the pool.

Mrs. Frank testified the Hoffinger liner came with labels cautioning against diving. She described the label as three-quarters of an inch wide and five and one-quarter inches long, stating: " '[C]aution [—] no diving [—] shallow water.' " She testified the labels were "most likely" on the pool the day of the accident.

At the Franks' pool the rule was "no diving." Although Mrs. Frank testified she never saw anyone jump into their pool, she acknowledged children probably jumped from the deck into the pool when her back was turned.

The day of the accident, Mrs. Frank testified she took Bunch and Erick by the hand and led them to the side of the pool. She told them: "This is a shallow pool, it is only four feet deep, no diving." Mrs. Frank did not mention the possibility of injury, nor did she warn Bunch she risked neck injury if she dove into the pool.

Just prior to the accident, the children were not in the pool. Mrs. Frank went into the house prior to Bunch's dive.

Mr. Frank testified he found his check register containing a notation for a check for the purchase of the replacement liner dated April 1988. When he purchased the liner from Waterworks, the box the liner came in had been previously opened. He was sure he got what he paid for, and testified the box showed no signs of being tampered with and the contents appeared to be intact.

Mr. Frank could not recall if the package contained any warning labels. Mr. Frank was certain he never saw a warning that cautioned against diving and warned about neck injuries. Had Hoffinger provided such a warning, he would have put it on the liner. If the warnings cautioned against putting a deck near the pool, Mr. Frank would not have placed the bench next to the pool.

Tyler Breeding, the other swimmer the day of the accident, also testified. According to Breeding, the Franks had a rule at their pool of no diving or jumping. Mrs. Frank told them " 'no diving.' " Breeding testified the Franks' pool had 15 to 20 warning labels circling the top of the pool. Breeding later retracted the statement concerning the labels.

Breeding stated he did not dive the day of the accident. Bunch dove twice. After the first dive, Mrs. Frank told Bunch not to dive or she could not continue to swim. Then Mrs. Frank walked into the house.

Out of the corner of his eye, while he was on the bench tying his shoe, Breeding saw Bunch dive again. Bunch made a sharp vertical dive; she did not make a shallow dive.

Bunch testified about the day of the accident. She stated she vaguely remembered stickers on the pool liner that day. The stickers said: " 'No diving in shallow water' " and showed a man making a "pike," or vertical, dive with the word " 'caution.' " Bunch believed the label warned her "[n]ot to dive like that."

Bunch had no memory of Mrs. Frank standing by the side of the pool, talking about the pool's depth and warning both her and Erick not to dive into the pool. Bunch did remember Mrs. Frank telling her not to dive on occasion. The day of the accident, Mrs. Frank said "be careful and don't dive."

Despite the warning, both Bunch and Breeding made shallow dives into the pool. The Franks allowed children to jump into the pool. According to Bunch: "Well, the sign [by the pool] said not to jump but she let us, so I figured she was just being a mom, and mom's [*sic*] say no all the time, so."

Bunch had watched the summer Olympics the previous year and tried to imitate the shallow racing dives of the Olympic swimmers. At other pools she practiced the shallow racing dive, diving far out and trying to go less than a foot into the water. Because she believed she dove well, Bunch never worried about diving too deeply.

On the day of the accident, after Mrs. Frank went into the house, Breeding and Bunch dove a few times from the deck into the pool. Bunch made flat racing dives.

Bunch then dove from the bench, trying to make a flat racing dive.[1] Bunch remembers little of the aftermath of the dive. After she hit the water her neck "felt like it hit my funny bone," and she had trouble breathing.[2]

---

[1] Hoffinger claims: "[Bunch] dragged a bench—not manufactured by [Hoffinger]—to the edge of the pool deck (also not manufactured by [Hoffinger]), climbed up and hurled herself head first with her hands by her sides into the shallow, above-ground pool." The trial transcript does not support Hoffinger's characterization of events.

[2] The accident dislocated Bunch's cervical spine, crushing her spinal cord. She was instantly

Bunch testified she was completely unaware of the danger of diving into a shallow pool. A warning pointing out the risk of severe injury would have prevented her from making the dive.

The pool liner itself was never admitted into evidence. As noted, Erick Bunch, Mrs. Frank, Mr. Frank, Tyler Breeding, and Bunch all provided conflicting testimony as to the existence and substance of any warning labels visible the day of the accident.

*Bunch's Experts*

Bunch presented testimony by Ross Buck, Ph.D., a professor of communication sciences and psychology at the University of Connecticut. According to Buck, effective warnings "act as brakes to stop dangerous behaviors." Buck outlined the components of an effective persuasive warning: it must command attention, galvanize memory, evoke emotion, contain an explicit instruction, and show a consequence. This kind of warning is especially important for children under the age of 12.

Buck also discussed pool culture and the behavior of children vis-à-vis swimming pools. According to Buck, the ethos of backyard swimming pools includes letting kids have fun. The pool and the surrounding atmosphere encourage rambunctious, rowdy behavior by children.

In addition, children are motivated to try new things. Eleven year olds think in concrete terms. These two factors, the urge to experiment and concrete thought processes, render the dangers of diving into a shallow pool not readily apparent to an 11-year-old child. Buck testified a young diver standing at the edge of an aboveground pool cannot necessarily judge the depth of the pool.

Buck discussed the standards for warning labels developed by the American National Standards Institute (ANSI). ANSI provides guidelines to manufacturers; these guidelines are not mandatory.

Buck also noted that from 1963 through 1971 various aboveground pool manufacturers ran ads showing children diving from both poolside and diving boards into aboveground pools. However, in 1977 Sears began putting labels on its pools stating: " '[D]anger [—] no diving [—] shallow water.' " The label was accompanied by a picture of a diver with a slash through it and the

---

completely paralyzed below the neck. She breathes only with the aid of a diaphragm pacemaker and a ventilator.

words: " 'Diving can cause paralysis.' " In 1983 Hoffinger began to use a warning label that said, in effect, "you could break your neck."

Buck also studied the claims history of Coleco, the swimming pool company Hoffinger bought in 1985. For the 10 years prior to instituting the paralysis warning, Coleco's claims records revealed between two and 10 claims per year for spinal cord injuries resulting from diving into Coleco pools. For the three years after Coleco employed the paralysis warning labels up until Hoffinger bought Coleco, there were no claims for spinal cord injuries.

In Buck's opinion, the labels that accompanied pool liners of the same vintage as the Franks' pool liner were neither adequate nor effective. The labels did not meet the minimum requirements for size under ANSI standards; the letters were too small. Most importantly, the labels failed to spell out any consequences of diving into shallow water.

Buck summarized his opinion of Bunch's accident: ". . . I conclude that Leesa's accident was caused by the pool. How can an inanimate object cause something? This is a pool, something that people have to act on in order for it to have any effect at all. [¶] But all the gas pedals were there; the expectations encouraging diving and discouraging strict rules; the playful, rowdy behavior pulled out of the kids by the pool environment; the dangerous shallowness of the pool not readily apparent to the diver. The effective brakes were not there; the eye-catching memorable, emotionally evocative, explicit warnings . . . that effectively communicate consequences."

Ralph Johnson, a professor and Ph.D. in sports administration, testified concerning the efficacy of warnings on children. Johnson described an effective warning as consisting of three parts: (1) an "attention getter," for example, "danger"; (2) a rule, such as "no diving"; and (3) the most important component, a consequence, such as "serious or fatal injury."

According to Johnson, it was both possible and feasible to put warnings on the liners at the factory instead of trusting the consumer to apply them after the liner was installed. Johnson described several methods of applying the warnings. In the alternative, Johnson stated manufacturers could take steps to insure consumers applied the warnings after set-up.

Johnson testified that many people who dive into aboveground pools are unable to gauge the depth of the pool. Johnson stated the risk of severe, permanent spinal injury was not readily apparent to an 11 year old. His review of the facts of the accident led Johnson to believe Bunch was attempting a shallow racing dive and had no idea of the possible consequences of the dive.

Johnson stated diving causes the majority of quadriplegic accidents. However, the pool industry has been reluctant to warn users of the risk and has been slow to employ warning labels. Current pool industry standards require manufacturers, not consumers, to prominently display on their pools tamper-proof warnings against diving.

*Cargile's Testimony*

Danny Cargile, Hoffinger's corporate customer relations and quality control manager, testified extensively regarding pool liners and warning labels. Cargile had worked for Hoffinger for 30 years. Cargile stated he was the most knowledgeable person at Hoffinger about warnings design, prior accidents, and the liner involved in this case.

During Bunch's case-in-chief, Cargile testified it was not feasible to put permanent warnings on the pool liner before it left the factory. Cargile admitted he saw no warning decals on the Franks' liner and acknowledged the system of delegating the attachment of the decals to the consumer "failed."

Cargile stated diving was a misuse of the pool but also acknowledged children diving presented a foreseeable misuse. Cargile admitted children are the ordinary users of Hoffinger's pools. Cargile also acknowledged Hoffinger knew children occasionally misused its pools by diving and that a liner is unsafe without warnings that children can readily understand. He admitted warnings work: they prevent crippling injuries resulting from diving into aboveground pools.

Cargile testified that Hoffinger's practice of delegating the duty to affix the warning to the consumer was proper. He stated an informal survey of pool owners revealed 95 percent installed the warning decals. However, Cargile could provide no records of the study or of any research by Hoffinger on warnings. Hoffinger routinely destroyed all such records.

Cargile testified it was not feasible to print warnings on pool liners. However, Cargile later admitted Hoffinger manufactures pool liners with preprinted designs for its Lomart pool division. Cargile stated Hoffinger conducted research and development projects but could not find a feasible way to print warnings on the liners. Cargile conceded Hoffinger never consulted any expert or anyone else outside the company to examine the feasibility of preprinted liners.

Cargile presented several reasons why preprinted warnings would not work. He stated the different models and styles of frames prevented positioning of the warnings so they could be read. However, Johnson testified this

problem could be overcome by printing the warning on several repeating bands, visible regardless of how the liner was hung.

Cargile also testified that preprinted warnings would become distorted by the stretching of the liner. Since several companies manufacture the above-ground pool frames, it is impossible to know in advance how much the liner might stretch. However, on cross-examination, Cargile's deposition testimony revealed Hoffinger's replacement liners do not stretch. The Franks' pool liner was a replacement liner that did not stretch.

Initially, during discovery, Cargile stated there had been only one prior case of a diver's becoming quadriplegic from diving into a Hoffinger pool. At trial, Cargile estimated there had been 10 such incidents. Documents produced by Hoffinger revealed there had been 47 incidents between 1977 and 1994. Although Cargile stated he was the Hoffinger employee most knowledgeable about prior claims, he was unaware of the Hoffinger document listing 47 quadriplegic claims.

The vintage of the Franks' liner became an issue during Cargile's testimony. In August 1988 Hoffinger began adding a warning in its replacement liner instruction manual against building decks or placing furniture near a pool. Hoffinger did not include such a warning in liners made prior to August 1988.

Cargile testified the Franks must have received the deck and furniture warning because the serial number of their liner ended with the letter "O." The "O" denoted a liner manufactured after August 1988, so the Franks must have purchased the liner around April 1989. Cargile could produce no documentation to corroborate his explanation of the Hoffinger serial numbers.

However, as stated *ante*, Mr. Frank located his check register just prior to trial. The check register contained an entry for the check he had written to Waterworks for the liner in April 1988. In light of the date of purchase, it appears the liner instruction manual did not contain the caution against placing decks and furniture next to the pool.

*The Verdict and the Aftermath*

The court instructed the jury on both design defect and failure-to-warn products liability theories. The jury returned a verdict in Bunch's favor. The jury answered in the affirmative the question: "Was there a defect in design or a failure to warn defect in the Doughboy Pool product, which includes the

liner and the accompanying materials, as to the defendant Hoffinger . . . ?" The jury also found the defect caused the injury and that the injury was reasonably foreseeable.

The jury awarded $16,112,306, an amount reduced by Bunch's comparative fault (5 percent) and the comparative fault of other nondefendants (20 percent). The trial court awarded Bunch $12,526,890.70 plus costs and awarded McMasker $1 million plus costs.

Hoffinger moved for a new trial. However, shortly thereafter, Hoffinger filed a notice of bankruptcy with the trial court. The trial court dropped the hearing on the motion for a new trial from the court's calendar. Hoffinger filed a timely notice of appeal.[3]

## DISCUSSION

### I. *Open and Obvious Danger*

Hoffinger contends the trial court erred in failing to enter a directed verdict in its favor since Hoffinger owed Bunch no duty to warn her of possible head injury from the open and obvious danger of diving headfirst into a shallow aboveground pool. According to Hoffinger, "Although no California court has ever considered the specific question of whether a pool or pool component manufacturer has the duty to warn a user of the dangers associated with diving head first into a shallow, above-ground pool, the jurisdictions that have considered these issues have consistently decided, citing policy reasons similar to those embraced by California in other contexts, that because an above-ground swimming pool is a simple product, the manufacturer is under no duty to warn of any dangerous conditions or characteristics that are readily apparent or visible upon casual inspection as reasonably expected to be recognized by the average user of ordinary intelligence."

The trial court may grant a motion for directed verdict " 'only when there is no substantial conflict in the evidence. In ruling on the motion, the court does not consider credibility of witnesses but gives to the evidence of the party against whom it is directed all its legal value, indulges every legitimate inference from such evidence in favor of that party, and disregards conflicting

---

[3] We grant the parties' five requests for judicial notice filed February 15, 2002; March 1, 2002; March 6, 2002; February 6, 2003; and February 13, 2003, relating to proceedings in bankruptcy court. We deny Bunch's motion to dismiss Hoffinger's appeal. Bunch argued Hoffinger failed to seek relief from the bankruptcy stay before filing the notice of appeal in this court. On February 8, 2002, the United States Bankruptcy Court granted Hoffinger's motion to retroactively annul the bankruptcy stay, effectively rendering Bunch's argument moot.

evidence.' [Citation.] The same test applies to the appellate court." (*Gouskos v. Aptos Village Garage, Inc.* (2001) 94 Cal.App.4th 754, 758 [114 Cal.Rptr.2d 558], italics omitted.)

### Cases Finding an Obvious Danger

In support, Hoffinger cites an impressive number of decisions, most notably *Glittenberg v. Doughboy Recreational Industries* (Mich. 1992) 441 Mich. 379 [491 N.W.2d 208] (*Glittenberg*). In *Glittenberg*, three adult plaintiffs sued pool manufacturers after sustaining head injuries and becoming paralyzed while attempting shallow dives into aboveground pools. Each plaintiff acknowledged that he knew the depth of the water in the pool and was aware that a deep dive into shallow water was dangerous. (*Id.* at p. 210.) On appeal, a sharply divided court held four to three that the plaintiffs could not recover for their injuries since pool manufacturers had no duty to warn of the danger of diving into an aboveground pool because the danger was open and obvious. (*Id.* at p. 213.)

The dissent in *Glittenberg* noted there was substantial evidence that the risk was not open and obvious. Expert testimony established a basic lack of public awareness of the great risk of spinal injury when diving. Even experienced divers fail to understand the potential for serious injury when diving into a shallow pool. (*Glittenberg, supra,* 491 N.W.2d at pp. 224–225 (dis. opn. of Levin, J.).)

The dissent also faulted the majority for failing to acknowledge the significance of the plaintiffs' attempts to execute "flat," as opposed to deep, dives. The majority opined that the plaintiffs attempted flat dives because they were aware of the danger and were attempting to avoid hitting bottom. However, the dissent noted the attempt at shallow dives revealed "that divers incorrectly perceive that execution of a shallow dive is sufficient protection from the danger presented by diving in a shallow aboveground swimming pool." (*Glittenberg, supra,* 491 N.W.2d at p. 225 (dis. opn. of Levin, J.).)

As Hoffinger observes, many courts adopt *Glittenberg*'s reasoning that "[t]he obvious risk of this simple product is the danger of hitting the bottom. When such a risk is objectively determinable, warnings that parse the risk are not required. The general danger encompasses the risk of the specific injury sustained. In other words, the risk of hitting the bottom encompasses the risk of catastrophic injury." (*Glittenberg, supra,* 491 N.W.2d at pp. 217–218.)

In *Neff v. Coleco Industries, Inc.* (D.Kan. 1991) 760 F.Supp. 864 (*Neff*), the 25-year-old diver admitted a familiarity with the aboveground pool and knowledge of the pool's depth. (*Id.* at p. 866.) The plaintiff made several

dives before diving and hitting the bottom, rendering him a quadriplegic. (*Ibid.*) However, the plaintiff stated he was unaware of the risks associated with diving headfirst into shallow water, including the risk of spinal cord injury. (*Ibid.*)

The district court found the defendant pool manufacturer entitled to judgment as a matter of law. The court concluded: "The potential consequences of diving head first into water of that depth [four feet] should be readily apparent to a reasonable man. We believe that the risk of propelling a six foot, two inch frame head first into shallow water is patent, open and obvious and should be readily apparent to a reasonable user of the swimming pool. Consequently, we conclude that defendant owed plaintiff no duty to warn him of the open and obvious risk of diving head first into the shallow swimming pool." (*Neff, supra,* 760 F.Supp. at p. 868; see also *Griebler v. Doughboy Recreational, Inc.* (Wis. 1991) 160 Wis.2d 547 [466 N.W.2d 897, 898] [diving into shallow water of unknown depth is an open and obvious danger requiring no warnings].)

A 15-year-old experienced swimmer, aware of the potential danger, dove off a sliding board platform into a five-foot-deep, below-ground swimming pool in *Benjamin v. Deffet Rentals, Inc.* (1981) 66 OhioSt.2d 86 [419 N.E.2d 883]. The Ohio Supreme Court approved summary judgment in favor of the pool owner and board manufacturer, finding the plaintiff aware of the potential risks. The court quoted earlier case law, stating: " 'While a child is required to exercise for his own safety only such care as children of like age, education, experience and ordinary prudence are accustomed to exercise under the same or similar circumstances, yet it may be assumed that a person of whatever age is able to appreciate the obvious risks incident to any sport or activity in which he may be able to engage with intelligence and proficiency, and must act accordingly.' " (*Id.* at p. 885.)

In *Kelsey v. Muskin Incorporated* (2d Cir. 1988) 848 F.2d 39, a 21 year old dove into an aboveground pool from a nearby railing, rendering him quadriplegic. The appellate court upheld the trial court's dismissal of the diver's complaint, finding: "Kelsey had just been in the pool; he plainly knew it was only four feet deep. The danger of a head-first dive into such a pool from the deck of a house some eight feet higher should have been obvious to a person of his age and diving experience." (*Id.* at p. 43.)

Hoffinger also points to California cases involving governmental immunity and dangerous dives. In *Valenzuela v. City of San Diego* (1991) 234 Cal.App.3d 258 [286 Cal.Rptr. 1] (*Valenzuela*) and *Rombalski v. City of Laguna Beach* (1989) 213 Cal.App.3d 842 [261 Cal.Rptr. 820], the court found cities immune for injuries suffered by teenagers diving from rocks into

shallow ocean water at public beaches. Government Code section 831.7, subdivision (b)(2) provides government agencies immunity from liability for hazardous recreation activities, including "[a]ny form of diving into water from other than a diving board or diving platform, or at any place or from any structure where diving is prohibited and reasonable warning has been given."

In *Valenzuela*, the court stated, in conjunction with its discussion of appropriate warning signs, that "[t]he mere placement of signs in a dangerous area does not reasonably induce the public to believe all other areas are safe. [Citation.] This is especially true where the danger is obvious, such as jumping off a rock into shallow water." (*Valenzuela, supra*, 234 Cal.App.3d at p. 262.)

Hoffinger seizes upon this remark, claiming: "This Court has acknowledged that striking one's head is an inherent risk of diving into shallow water." However, this court did not decide *Valenzuela*, and the *Valenzuela* court did not determine, as a matter of law, that striking one's head is an inherent risk of diving headfirst from a raised platform into shallow water.

Interestingly, one of the cases cited by Hoffinger sets forth the schism between courts on the issue of whether diving into shallow pools constitutes an open and obvious danger. In *McCormick v. Custom Pools, Inc.* (Minn.Ct.App. 1985) 376 N.W.2d 471 (*McCormick*), a diver of undisclosed age was injured by a dive into the shallow end of a pool. McCormick considered himself an experienced swimmer, had made a number of prior dives, knew he was diving into the shallow end, and intended to dive into the shallow end. (*Id.* at pp. 472–473.)

The Minnesota Court of Appeals affirmed summary judgment in favor of the pool manufacturer. The court, in considering McCormick's awareness of the risks involved in shallow diving, discussed two cases that reached opposite results in similar situations. In *Colosimo v. May Department Store Co.* (3d Cir. 1972) 466 F.2d 1234 (*Colosimo*), an experienced 15-year-old swimmer was injured when he dove off a pool ladder into a small above-ground pool less than three feet deep.[4] The court determined that neither the platform atop the pool ladder nor the absence of warning signs proximately caused the plaintiff's injuries. The plaintiff was aware of the risk of striking the bottom of the pool, and the court held the plaintiff's error of judgment in diving, not the dearth of warning signs, caused the accident. (*Id.* at p. 1236.)

---

[4] The plaintiff had eight years of swimming experience and four Red Cross courses in various aspects of swimming, including diving. (*Colosimo, supra*, 466 F.2d at p. 1235.)

Conversely, in *Corbin v. Coleco Industries, Inc.* (7th Cir. 1984) 748 F.2d 411 (*Corbin*), the court reversed summary judgment in favor of a pool manufacturer. The manufacturer argued, and the district court found, that the danger of diving into four feet of water is open and obvious. The appellate court disagreed, finding the plaintiff had produced evidence that "the danger of serious spinal cord injury from diving into shallow water is not open and obvious . . . ." (*Id.* at p. 417.)

In *Corbin*, the appellate court considered expert testimony regarding the public's belief that there is a safe way to dive into a shallow pool: "The crucial point made in this testimony is that even though people are generally aware of the danger of diving into shallow water, they believe that there is a safe way to do it, namely, by executing a flat, shallow dive. If people do in fact generally hold such a belief, then it cannot be said, as a matter of law, that the risk of spinal injury from diving into shallow water is open and obvious. Whether a danger is open and obvious depends not just on what people can see with their eyes but also on what they know and believe about what they see. In particular, if people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in the way generally believed to be safe is not open and obvious." (*Corbin, supra*, 748 F.2d at pp. 417–418.)

The *Corbin* court found a "genuine issue of material fact as to whether Corbin knew that he risked spinal injury by diving into shallow water, even if he attempted a flat, shallow dive. If he did not know this, then a conspicuous warning on the side of the pool could very well have deterred him from diving. Thus summary judgment for Coleco on the basis of Corbin's knowledge of the danger was inappropriate." (*Corbin, supra*, 748 F.2d at p. 418.)

After comparing the factual underpinnings in both *Colosimo* and *Corbin*, the court in *McCormick* found the facts before it more similar to those in *Colosimo*. The court noted the plaintiff in *Corbin* was an "average" swimmer who had never before swum in an aboveground pool. In contrast, the plaintiff in *Colosimo* was a very experienced swimmer. The appellate court affirmed the trial court's finding that as a matter of law McCormick was aware of the dangers of shallow diving: "In McCormick's deposition, he states unequivocally that he was a good and accomplished swimmer and, at the time of the accident, he intended to do a 'body surf dive.' It appears from the record that McCormick knew he had to execute a surface dive to avoid the serious risks involved in shallow diving." (*McCormick, supra*, 376 N.W.2d at p. 476.)[5]

---

[5] Three judges dissented, citing expert testimony about the need for potent warnings about shallow diving. The expert stated: " '[P]ool manufacturers and installers have studies, and have sophisticated knowledge regarding the dangerous propensities of diving into the shallow end of a pool. The general public is not aware of this empirical data and its conclusions. . . . [T]here

*No Obvious Risk*

A number of courts have considered the issue of diving into shallow pools and found the risk of serious injury neither open nor obvious. Bunch and McMasker urge us to follow these cases.

In *Fleck v. KDI Sylvan Pools, Inc.* (3d Cir. 1992) 981 F.2d 107 (*Fleck*), the adult plaintiff dove into a three-and-one-half foot deep, aboveground swimming pool and broke his neck. Neither the pool nor its replacement pool liner had depth markers or "no diving" warnings. Hoffinger, maker of the liner, had provided decals that had never been used. The plaintiff arrived at a party, drank four or five 12-ounce cups of beer, smoked marijuana, and proceeded to climb to the deck surrounding the pool and dive in headfirst. The plaintiff had never previously used the pool and testified the pool looked six feet deep. The pool owner confirmed this impression, stating that at times the pool appeared 12 feet deep. The plaintiff testified that if there had been depth markers or warnings he would have known not to dive into the pool. (*Id.* at p. 112.)

The jury found that the liner lacked an element necessary to make it safe for reasonably foreseeable use and that the defect was a substantial factor in bringing about the harm. The jury awarded the plaintiff $10 million. (*Fleck, supra*, 981 F.2d at pp. 112–113.)

On appeal, the defendants argued the danger associated with diving into a body of water of uncertain depth is open and obvious, and the axiom "look before you leap" should bar the plaintiff's suit. The appellate court disagreed. (*Fleck, supra*, 981 F.2d at p. 119.)

The *Fleck* court noted that whether a danger is open and obvious is an objective inquiry, not dependent upon the actual knowledge of the user or his actual awareness of the danger. The court explained: "We inquire whether knowledge of the danger would be possessed by 'the ordinary consumer who purchases [or uses the product], with the ordinary knowledge common to the community as to its characteristics.' [Citation.] For instance, '[i]f the product is one customarily used by children, the danger must be one which children would be likely to recognize and appreciate in order to prevent them from

---

is a great disparity between the sophisticated knowledge of the profit-oriented manufacturer and installer, and the ignorance of the pool user who has not studied the subject.' " (*McCormick, supra*, 376 N.W.2d at p. 478 (dis. opn. of Crippen, J.).) The dissent concluded: "There is a genuine issue whether the causative impact of respondent's fault, as indicated by appellant's expert, was great enough to permit recovery of a more experienced swimmer who was nevertheless vulnerable to lack of sophisticated information, general public misperceptions and the unwillingness of the manufacturers and suppliers to properly inform users or the public about the treacherous dangers in shallow diving." (*Id.* at pp. 478–479.)

recovering for a product related injury on the grounds that the danger was open and obvious.' [Citation.]" (*Fleck, supra*, 981 F.2d at p. 119.)

With these precepts in mind, the *Fleck* court concluded it is clearly foreseeable that children and adults would dive into a pool of unknown depth. The jury could reasonably conclude that the plaintiff in *Fleck* believed the pool was six feet deep, since decking concealed the sides of the pool and the owner testified the depth was deceptive. According to the court, "[w]hile Fleck may still have been imprudent to do what he did, we cannot say that 'foolhardiness' was the cause of the accident. Fleck testified that had there been warnings about the depth of the pool or the danger of diving into this pool, he would not have attempted a dive. [¶] The danger was not open and obvious; so the product was defective, and there was a duty to warn." (*Fleck, supra*, 981 F.2d at p. 120.)[6]

In *Jonathan v. Kvaal* (Minn.Ct.App. 1987) 403 N.W.2d 256 (*Jonathan*), the Minnesota Court of Appeals found a plaintiff's knowledge of the extent of the danger in diving into a shallow pool presented a question of fact for the jury. The 24-year-old plaintiff in *Jonathan* had previously used the aboveground pool on at least 10 occasions. He was aware of a sign warning against jumping and diving and of depth markers. On one occasion, the plaintiff jumped into the pool from the nearby roof, rousing the pool owner's ire. (*Id.* at p. 258.) One evening, the plaintiff drank an unknown quantity of strong beer, jogged alongside the pool, and dove into the shallow end, severely injuring his spine. (*Ibid.*) The plaintiff considered himself a fair swimmer without any formal instruction and had previously made numerous shallow dives into the shallow end of the pool. (*Ibid.*) In opposing the defendant's motion for summary judgment, the plaintiff submitted an affidavit by an expert in pool design. The expert stated aboveground pools create risks of injury well known in the pool industry but unknown to the general public. (*Ibid.*)

The trial court granted summary judgment, finding the plaintiff was familiar with the pool based on his frequent use and also describing the plaintiff as an experienced swimmer and diver. The trial court determined the plaintiff's negligence was the sole cause of his injuries and the injuries were not caused by any breach of duty by the pool manufacturer. The appellate court reversed. (*Jonathan, supra*, 403 N.W.2d at pp. 258–259.)

The court noted that the plaintiff's expert stated the general public was unaware that headfirst diving into aboveground pools posed a risk of serious

---

[6] The court also found Hoffinger failed to warn of the danger. (*Fleck, supra*, 981 F.2d at p. 120.)

injury. The plaintiff stated he was unaware he was risking serious injury by entering the pool from ground level. The court concluded: "Here, Jonathan's knowledge as to the extent of the danger in using the pool is a fact issue for the jury. Here, our analysis is not limited to questions of breach of duty only but involve, as well, issues of causation, for liability does not arise unless and until there is a breach of duty that is a direct cause of injury. These are triable issues of fact not to be resolved by summary judgment." (*Jonathan, supra,* 403 N.W.2d at pp. 261–262.)[7]

### Children Diving into Shallow Water

Most of the cases discussed thus far involved adults injuring themselves after diving into shallow water. However, in this case we consider a diving accident involving Bunch, 11 years old at the time of the tragedy. Courts considering diving mishaps involving children perceive "open and obvious" dangers in a slightly different light than dangers involving adults.

A 14 year old attempted a shallow dive from a trampoline into an aboveground pool in *Klen v. Doughboy Recreational, Inc.* (Ill.App.Ct. 1994) 643 N.E.2d 1360 (*Klen*). Prior to the dive, the plaintiff stood and walked around the perimeter of the pool, knew the water was chest deep, and knew that the sides of the pool were about four feet high. The plaintiff had taken seven years of swimming lessons and had learned to dive in both deep and shallow water. He also had experience in swimming in similar aboveground pools. The plaintiff stated he understood it was possible to dive into shallow water without injury by executing a flat, racing-type dive that others had performed the night of the accident. He believed the dive he was attempting was safe. (*Id.* at pp. 1362–1363.)

Rendered quadriplegic by the accident, the plaintiff filed suit against the pool manufacturer, alleging a failure to warn of the risk of permanent neurological injury presented by the intended and foreseeable use of the pool. (*Klen, supra,* 643 N.E.2d at p. 1362.) The trial court denied summary judgment to the defendant pool manufacturer, finding a question of fact existed as to whether the risk of quadriplegia was open and obvious to a 14 year old and " 'whether or not a 14 year old is chargeable with knowledge of circumstances that people who are adults who have experience would be chargeable.' " (*Id.* at p. 1364.)

The pool manufacturer appealed, arguing the trial court erred in applying a subjective standard to the duty to warn and urging the use of an adult

---

[7] Several judges dissented in *Jonathan*, finding the plaintiff's intentional dive into a shallow pool was the sole cause of his injuries. (*Jonathan, supra,* 403 N.W.2d at pp. 263–268.)

standard of reasonableness. (*Klen, supra,* 643 N.E.2d at pp. 1364–1365.) The appellate court affirmed the denial of summary judgment.

The Appellate Court of Illinois began by noting: "A duty to warn of an unreasonably dangerous condition extends to the use of the product by an ordinary person with the ordinary knowledge common to the community regarding the characteristics of the product. [Citation.] The duty to warn is determined using an objective standard, *i.e.,* the awareness of an ordinary person [citation], and is normally a question of law [citation], although when the record is in dispute, it becomes a question of fact [citation]. [¶] The duty to warn analysis, which is an objective one, should focus on the typical user's perception and knowledge. The plaintiff's subjective knowledge is immaterial to the antecedent determination of an open and obvious danger." (*Klen, supra,* 643 N.E.2d at p. 1363, fn. omitted.)

The court disagreed with the defendant's assertion that the trial court had shifted from an objective standard to a subjective standard in denying summary judgment. Rather, "the standard remained an objective one, but the reasonable person standard was that of a reasonable child of fourteen years of age rather than a reasonable adult." (*Klen, supra,* 643 N.E.2d at p. 1365.)

As to the issue of whether the open and obvious nature of the danger should be judged by the standard of a reasonable adult or child, the court noted the age of the plaintiff was relevant in products liability cases and premises liability cases. (*Klen, supra,* 643 N.E.2d at p. 1365.) The court considered various cases that recognized a distinction must be made between an adult's ability to recognize and appreciate certain risks and a child's corresponding ability.

The court concluded: "Certain conditions considered harmless to adults may not be so to the general class of children who, by reason of their immaturity, might be incapable of appreciating the risk involved. [Citation.] The conclusive finding that children, due to their immaturity might be incapable of appreciating certain risks open and obvious to adults, is no less conclusive when children are exposed to dangerous risks from products rather than from conditions on the land. Since it would be illogical to expect the danger created by a condition of a product to be any more obvious than a danger created by a condition on the land, where the use of a product by children is reasonably foreseeable, as is the case here, the determination of what is open and obvious to children should be based upon what is true for children as opposed to what is true for adults. Thus, in the instant case the determination of whether the risk of paraplegia was open and obvious must be judged by the reasonable or objective class of fourteen-year-olds . . . ." (*Klen, supra,* 643 N.E.2d at p. 1366.)

The *Klen* court also reviewed cases involving children making shallow dives into a public lake. In *Schellenberg v. Winnetka Park District* (Ill.App. 1992) 596 N.E.2d 93 (*Schellenberg*), the defendant park district argued the danger of shallow dives was obvious and understood by a 15-year-old diver. The *Schellenberg* court disagreed, noting: " '[T]he danger of diving head first into shallow water may seem at first glance to be a matter of common knowledge and understanding for which expert opinion is not needed. However, closer examination of the evidence indicates that the nature and extent of the danger of surface or horizontal diving by teenagers in all probability is not commonly understood, even by many adults of considerable experience.' " (*Id.* at p. 96.)

The *Klen* court then reviewed *Corbin* and *Glittenberg*, which we have previously discussed. As to *Corbin*, the court noted: "To the extent *Corbin* finds that the danger of executing a flat or 'shallow' dive by an adult is not open and obvious, we do not reach that conclusion here nor do we necessarily agree that it would not be open and obvious to an adult. [Citation.] We do believe, however, that the reasoning in *Corbin* does have application with respect to minors and is in accord with . . . *Schellenberg* . . . ." (*Klen, supra,* 643 N.E.2d at pp. 1368–1369.) The court also distinguished *Glittenberg*, noting the plaintiff in *Glittenberg* was an adult. (*Klen,* at p. 1369.)

Ultimately, the court concluded, based upon the evidence and pleadings before it, "it is by no means evident that, as a matter of law, the dangers of 'shallow' or surface diving into a shallow pool are open and obvious to minors. . . . Where there is doubt, the obviousness of the danger is for the jury to determine. . . . [¶] . . . [¶] It would further seem that having made the determination that the risk of executing 'shallow' or surface dives is not open and obvious to minors as a matter of law, the jury could then be asked to redetermine this question as an issue of fact. In addition, the defense is not precluded from raising the subjective awareness of the Plaintiff as a question of fact with respect to assumption of risk [citation] and proximate cause." (*Klen, supra,* 643 N.E.2d at pp. 1369–1370.)

We find the reasoning of *Klen* persuasive. As our review of cases from various jurisdictions makes clear, courts have grappled with the issue of *adult* awareness of the dangers of diving into shallow water. The results have been mixed, with several courts sharply divided over whether such danger is open and obvious to an adult. Courts have considered prior swimming and diving experience, familiarity with the pool in question, and the public's general awareness of diving dangers in determining whether the danger is open and obvious to adults. It appears absurd and somewhat illogical to consider these factors in determining an awareness of danger but to ignore or exclude the age of the diver.

██ Lacking any guidance from California law, we adopt the reasoning of *Klen* and find that the danger of diving into a shallow aboveground pool is not open and obvious to an 11 year old as a matter of law. Therefore, the trial court did not err in declining to enter a directed verdict in favor of Hoffinger.

## II. *Assumption of Risk*

Hoffinger argues the trial court misapplied the doctrine of primary assumption of risk, which, if applied correctly, would provide a complete defense against Bunch's claims. Bunch and McMasker respond that assumption of risk is not an available defense in a products liability action.

██ Under the doctrine of primary assumption of risk, a person who chooses to engage in a sporting activity may not generally recover damages for injuries that result from risks inherent in the sport. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 320 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*).) Where the risk of harm is so inextricably a part of the sport and so obvious to any participant, a defendant is relieved of any duty that might otherwise exist. As Justice Cardozo reflected, "One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary . . . . The antics of the clown are not the paces of the cloistered cleric. The rough and boisterous joke, the horseplay of the crowd, evokes its own guffaws, but they are not the pleasures of tranquility. . . . The timorous may stay at home." (*Murphy v. Steeplechase Amusement Co.* (N.Y. 1929) 250 N.Y. 479 [166 N.E. 173, 174].)

Hoffinger contends assumption of risk applies because, in diving, Bunch engaged in a sport that required a certain amount of skill. Diving into a shallow pool involved a potential risk of injury, and the assumption of risk doctrine derives from the realization that some activities involve risk.

However, assumption of risk does not insulate equipment suppliers from liability for injury from providing defective equipment. In *Bjork v. Mason* (2000) 77 Cal.App.4th 544 [92 Cal.Rptr.2d 49] (*Bjork*), a plaintiff riding behind a motorboat in an inner tube was injured when the rope broke and struck him. The trial court applied the assumption of risk doctrine and granted the boat driver's summary judgment motion. The court found the driver a coparticipant who had done nothing to increase the risk.

The appellate court reversed. The court found the driver more than a coparticipant; he had provided the rope that injured the plaintiff. As the supplier, the driver was not covered by assumption of the risk but was subject to general negligence rules. The court concluded: "[T]he act of supplying the equipment is something separate and distinct from participation in the sport

and the tests for liability are accordingly different." (*Bjork, supra,* 77 Cal.App.4th at p. 553, italics omitted.) The driver, by supplying the defective rope, increased the risk of harm to the plaintiff beyond what was inherent in the sport. (*Id.* at p. 554.)

In *Milwaukee Electric Tool Corp. v. Superior Court* (1993) 15 Cal.App.4th 547 [19 Cal.Rptr.2d 24] (*Milwaukee*), the court considered assumption of risk in a products liability context. In *Milwaukee,* the plaintiff suffered injuries while using a heavy-duty drill manufactured by the defendant. The defendant moved for summary adjudication, arguing the undisputed facts established the plaintiff's claim was barred by primary assumption of the risk. The appellate court affirmed the trial court's denial of the defendant's summary adjudication motion.

The court reasoned that primary assumption of risk " 'embodies a legal conclusion that there is "no duty" on the part of the defendant to protect the plaintiff from a particular risk . . . .' " (*Milwaukee, supra,* 15 Cal.App.4th at p. 560, quoting *Knight, supra,* 3 Cal.4th at p. 308.) However, under products liability, the manufacturer does owe a duty to produce defect-free products. (*Milwaukee, supra,* 15 Cal.App.4th at p. 562.) In addition, in using a defective product, the user does not intend to confront a risk that is inherent in its use. (*Id.* at pp. 562–563.) To the extent the user does elect to use the product with knowledge of the danger posed by the defect, the user's actions are subsumed by comparative negligence. The manufacturer is not relieved of its duty to make a product without defect. (*Ibid.*)

The *Milwaukee* court concluded: "[W]e believe that the purposes of strict products liability doctrine will be well served by a finding that a manufacturer owes a duty to a user of its product, thus making the primary assumption of the risk doctrine inapplicable, absent some extraordinary circumstance . . . ." (*Milwaukee, supra,* 15 Cal.App.4th at p. 565.)

Hoffinger cites *Sanchez v. Hillerich & Bradsby Co.* (2002) 104 Cal.App.4th 703 [128 Cal.Rptr.2d 529] (*Sanchez*) for the proposition that assumption of risk does apply in cases involving sporting equipment. In *Sanchez,* a college baseball pitcher suffered serious injuries when struck by a line drive hit by an aluminum bat. The pitcher sued the bat manufacturer and others, alleging the bat's design significantly increased the risk inherent in the sport of baseball that a pitcher would be hit by a line drive. (*Id.* at pp. 706–707.) The manufacturer successfully moved for summary judgment based on primary assumption of risk and on grounds that the pitcher would be unable to prove causation. (*Id.* at p. 707.)

The appellate court reversed. The court found the pitcher presented sufficient evidence to establish that the use of the aluminum bat significantly

increased the inherent risk that a pitcher would be hit by a line drive. (*Sanchez, supra,* 104 Cal.App.4th at p. 707.) However, the court did not discuss the interplay between products liability and primary assumption of risk. Nor did the court discuss or distinguish *Milwaukee.* The *Sanchez* court simply found a triable issue of fact existed as to whether primary assumption of risk applied to the facts before it. (*Sanchez,* at p. 715.) *Sanchez* thus does not assist Hoffinger.

### III. *Proximate Cause*

Having already considered and dispatched Hoffinger's contention that it owed no duty to warn Bunch of the danger of diving because the danger was open and obvious, we next consider a different incarnation of the argument. A manufacturer is liable only if the product was a proximate cause of the plaintiff's injury. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 120 [184 Cal.Rptr. 891, 649 P.2d 224].) According to Hoffinger, Bunch "had been warned not to dive, that she could be hurt if she dove, and she dove anyway." Further, "the danger associated with executing a headfirst vertical dive from a chair into water known to be less than four feet in depth is open and obvious." Bunch's own actions, Hoffinger argues, not the lack of sufficient warning labels, were the proximate cause of her injuries.

■ " 'In the context of products liability actions, the plaintiff must prove that the defective products supplied by the defendant were a substantial factor in bringing about his or her injury.' " (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 696 [11 Cal.Rptr.3d 807].) " 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' [Citation.] Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor' [citation], but a very minor force that does cause harm is a substantial factor [citation]. This rule honors the principle of comparative fault." (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79 [86 Cal.Rptr.2d 846, 980 P.2d 398] (*Bockrath*).) A plaintiff need not establish that a defendant's product was the sole potential proximate cause of injury, but only that the defendant's conduct substantially contributed to the injury and the circumstances make it just to hold the defendant responsible for the consequences of the accident. (*Bates v. John Deere Co.* (1983) 148 Cal.App.3d 40, 50 [195 Cal.Rptr. 637].)

■ A plaintiff's misuse of a product may be a cause of the plaintiff's injuries. However, if the product's manufacturer could foresee the misuse, the manufacturer remains liable unless it provides an adequate warning. A manufacturer is required to foresee some degree of misuse and abuse of a

product and to take reasonable precautions to minimize the resulting harm. (*Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 833 [20 Cal.Rptr.2d 296].) As Bunch points out, the extent to which a manufacturer must anticipate the misuse of its product and the adequacy of a product warning present issues of fact. (*Id.* at p. 835.) Our review is limited.

Here, the jury could find Hoffinger's pool design the proximate cause of Bunch's injuries if it found the pool's design was a "more than negligible or theoretical" factor that contributed to Bunch's injuries. We note the trial court instructed the jury in the concept of "substantial factor" in relation to both design defect and failure to warn. The court instructed that the jury must find "that the design of the warning system for the pool liner was a substantial factor in causing harm to the plaintiff." The court also instructed that the jury must find a "lack of sufficient warnings was a substantial factor in causing plaintiff's harm."

Hoffinger concedes Bunch need not establish that its product was the only potential proximate cause of her injuries, but argues "any alleged deficiency falls far short of being a causal substantial factor in this incident." Instead, Hoffinger points to a variety of other causes of the tragedy: Mrs. Frank's decision to leave four young children unsupervised, Mr. Frank's decision not to affix the warning labels supplied with the replacement liner, and Bunch's decision to disregard any warnings and dive into the pool. Therefore, Hoffinger contends, the record "fails to establish or support an inference that more or different warnings would have prevented this accident: in other words, as a matter of law, there is no evidence of cause in fact or legal causation attributable to any alleged failure by [Hoffinger]." In effect, Hoffinger challenges the sufficiency of the evidence to support the jury's finding that its product was a substantial factor in bringing about Bunch's injuries.

In determining whether a judgment was supported by substantial evidence, we consider all the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving conflicts in favor of the judgment. We do not reweigh the evidence, but instead determine whether the record contains substantial evidence, contradicted or uncontradicted, to support the judgment. (*McMahon v. Albany Unified School Dist.* (2002) 104 Cal.App.4th 1275, 1282 [129 Cal.Rptr.2d 184].)

At trial, Bunch testified she believed Mrs. Frank's admonition against diving was just "being a mom, and mom's [*sic*] say no all the time." Bunch believed the warning sticker showing a man doing a "pike" dive and stating "caution" meant do not do a pike dive. After being shown a 1989 Doughboy caution label depicting a man with lightning bolts coming out of his head and

stating "crippling injury" and "danger," Bunch testified such a warning would have prevented her from diving the day of the accident. Bunch stated she did not know she could break her neck if she dove into four feet of water.

Dr. Buck, Bunch's expert, testified that a young diver standing at the edge of an aboveground pool cannot necessarily judge the depth of the pool. Warnings act as "brakes to stop dangerous behaviors." Warnings to children between the ages of seven and 12 must be concrete and spell out the dangers and consequences of actions in order to be effective. Buck found the labels supplied with the Hoffinger pool liner neither adequate nor effective. The labels failed to spell out any consequences of diving into shallow water. Buck reviewed the history of warning labels and claims of injury and found that the instances of injury decreased as the explicitness of the warnings increased.

Dr. Johnson, another of Bunch's experts, testified that based on his experience and research, the risk of spinal paraplegia was not readily apparent to an 11 year old. Many people who dive into pools are unable to gauge the depth of the water. After reviewing the facts, Johnson opined that Bunch was attempting a shallow racing dive and was unaware of the possible consequences of that dive.

Johnson also testified that pool industry standards require manufacturers to prominently display permanent warnings on their pools. Johnson outlined several methods of installing adequate warnings during a pool's manufacture.

█ Given the testimony of Bunch and her two expert witnesses, we find sufficient evidence to support the conclusion that the lack of an adequate warning label was neither a negligible nor theoretical contribution to Bunch's injury. The evidence presented at trial revealed that the lack of a persuasive label outlining the consequences of diving into the pool was a substantial factor in causing the injury. As the Supreme Court points out, " 'a very minor force that does cause harm is a substantial factor.' " (*Bockrath, supra,* 21 Cal.4th at p. 79.) Here, at the very least, the lack of an effective warning was a minor force in bringing about the fateful dive.

IV.–VI.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 1278.

## DISPOSITION

The judgment is affirmed. Bunch and McMasker shall recover costs on appeal.

Scotland, P. J., and Nicholson, J., concurred.

A petition for a rehearing was denied December 7, 2004, and appellants' petition for review by the Supreme Court was denied February 16, 2005. Baxter, J., Chin, J., and Brown, J., were of the opinion that the review should be granted.